

FILED

Oct 16 2018, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney
General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Steven Bethel,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

October 16, 2018

Court of Appeals Case No.
18A-PC-117

Appeal from the St. Joseph
Superior Court

The Honorable Elizabeth C.
Hurley, Judge

Trial Court Cause No.
71D08-1604-PC-46

**Barteau, Senior Judge.**

## Statement of the Case

[1] Steven Bethel appeals the denial of his successive petition for post-conviction relief. We affirm.

# Issue

Bethel raises one issue, which we restate as: whether the post-conviction court erred in denying his claim of ineffective assistance of trial counsel.

# Facts and Procedural History

The facts of Bethel's case, as stated by the Indiana Supreme Court, are as follows:

> [O]n March 5, 1991, the defendant agreed to assist Curtis Crenshaw in obtaining money and [ ] they went to the J & S Dairy Mart in South Bend, Indiana, at approximately 11:20 p.m. Armed with handguns, they approached Robaska and Wrobel, two store employees, as they were closing the store. The defendant held a gun to Robaska's head, Crenshaw grabbed Wrobel, and together they forced the two clerks back into the store. The defendant and Crenshaw tried unsuccessfully to obtain cash from the safe. One of the robbers threatened to shoot Robaska. They also forced Wrobel to empty his pockets, but he had no cash. The defendant and Crenshaw then took the two clerks back outside, told them to lie on the ground behind an ice machine, and began walking away. Robaska and Wrobel got up and observed the defendant and Crenshaw. Describing the ensuing events, Wrobel testified:
>
> They were about fifteen feet away, and [Crenshaw] turned around, and he pointed the gun at us, and I grabbed Patty [Robaska] and pulled her back down because I knew what comes out of a gun. And we laid there, and we heard a fire.
>
> There was no testimony as to the length of time that elapsed between the time Wrobel and Robaska went back down to the ground and the time the shot was fired. No witnesses testified as to the position of Crenshaw's weapon or the direction it was pointed when fired. There was no injury to either Robaska or

Wrobel, nor was there evidence of bullet damage to the ice machine or surrounding area. No bullet was recovered.

Approximately ten minutes later, the defendant and Crenshaw entered the Burger Dairy store in South Bend and found three men inside. They robbed the three at gunpoint, taking cash from the register and a wallet from one of the men. During the robbery, Charles Flora attempted to enter the store, and the defendant pointed a gun at him. Flora ran to his van in the parking lot and called the police from his van. The defendant and Crenshaw came out of the store while Flora was still in the lot. The direct examination of Flora includes the following:

[Prosecutor] Did—before you were shot at, did you see the people that came out of the store? You said you saw them, right?

[Flora] When they both ran out of the store, they both looked directly at my van.

[Prosecutor] Did you see whether they had anything in their hands?

[Flora] They had a gun in their hand.

[Prosecutor] Both of them?

[Flora] I'm not sure if both of them did. One I know did.

[Prosecutor] Was the gun pointed at you?

[Flora] When they ran out, no.

[Prosecutor] At some point in time, was it?

[Flora] Yes.

[Prosecutor] When was that?

[Flora] They was partly across the drive lot, and they pointed at my van, and I heard two or three shots. I know it was more than one shot.

> [Prosecutor] What did you do?
>
> [Flora] Well, I got down in my van and proceeded to go back up onto the lot because I didn't know what to do.
>
> Neither Flora nor his van was hit, and no bullets were ever found. Although Flora stated at trial that he did not see and was "not sure" which of the two men shot at him, record at 681, he testified that he gave a statement to police within about an hour of the shooting in which he identified Crenshaw as the person who shot at him. As the defendant and Crenshaw attempted to flee, they successively encountered two police officers and fired shots at each officer.

*Bethel v. State*, 730 N.E.2d 1242, 1244-45 (Ind. 2000) (footnotes and record citations omitted).

[4] Officers captured Bethel and Crenshaw after a car chase, which ended when Crenshaw crashed the car. During the chase, an officer saw Bethel throw something out of the car. A police officer with a K-9 unit later searched the area and found a revolver. The same officer found a second revolver near the Burger Dairy store. Robert Lucas, who worked at the Burger Dairy store, recognized the revolvers as the guns that were used in the attempted robbery.

[5] The State charged Bethel with two counts of attempted robbery, two counts of robbery, and four counts of attempted murder. The State further alleged he was an habitual offender. Bethel was tried by jury and testified in his own defense, claiming Crenshaw forced him under threat of death to accompany him as he committed the offenses. The jury determined Bethel was guilty as charged and was also an habitual offender. The trial court sentenced Bethel to 120 years.

[6] Bethel belatedly appealed. The Indiana Supreme Court reversed two of the counts of attempted murder, determining that there was insufficient evidence to prove that he had attempted to kill Robaska and Flora. *Id.* at 1246. The Court affirmed his other convictions. The reversal of the two convictions resulted in Bethel's sentence being reduced to 102 years.

[7] Next, Bethel filed a petition for post-conviction relief in Cause Number 71D08-0502-PC-10. The post-conviction court denied Bethel's petition in 2012, and he appealed. Bethel claimed on appeal that the trial court had erred in admitting certain evidence and in determining that he was an habitual offender. A panel of this Court issued a memorandum decision affirming the post-conviction court's judgment, concluding both claims were waived for post-conviction review. *Bethel v. State*, No. 71A03-1203-PC-139 (Ind. Ct. App. Feb. 25, 2013).

[8] A panel of this Court later authorized Bethel to file a successive petition for post-conviction relief. *Bethel v. State*, No. 71A04-1602-SP-396 (Ind. Ct. App. March 29, 2016). Next, Bethel filed a successive petition alleging ineffective assistance of counsel. The post-conviction court held an evidentiary hearing and denied Bethel's successive petition. This appeal followed.

## Discussion and Decision

[9] In his successive petition for post-conviction relief, Bethel claimed he received ineffective assistance of trial, appellate, and post-conviction counsel. In this appeal, Bethel presents only a claim of ineffective assistance of trial counsel.

[10] The purpose of a petition for post-conviction relief is to provide a means for raising issues unknown or unavailable to a defendant at the time of the original trial and appeal. *Dixon v. State*, 760 N.E.2d 613, 614 (Ind. Ct. App. 2001). When a petitioner has already been afforded the benefit of a direct appeal, post-conviction relief contemplates a rather small window for further review. *Emerson v. State*, 812 N.E.2d 1090, 1095 (Ind. Ct. App. 2004). Thus, post-conviction procedures do not provide petitioners with a "super appeal." *Richardson v. State*, 800 N.E.2d 639, 643 (Ind. Ct. App. 2003), *trans. denied*.

[11] Post-conviction proceedings are civil proceedings in which the petitioner must prove claims by a preponderance of the evidence. *Hampton v. State*, 961 N.E.2d 480, 491 (Ind. 2012). When appealing from the denial of a petition for post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Campbell v. State*, 19 N.E.3d 271, 274 (Ind. 2014). To prevail on appeal, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*.

[12] The post-conviction court made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). On review, findings of fact are accepted unless they are clearly erroneous. *Witt v. State*, 938 N.E.2d 1193, 1196 (Ind. Ct. App. 2010), *trans. denied*. The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.* By contrast, we do not defer to the post-conviction court's legal conclusions. *Campbell*, 19 N.E.3d at 274.

[13] Bethel argues his trial counsel rendered ineffective assistance by presenting evidence and argument in support of a defense of duress even though that defense was legally unavailable in his case. He claims his attorney "chose to adhere to a defense that was clearly not legally available" and demonstrated he did not "know the applicable law" or "simply chose to ignore the settled law in this area." Appellant's Br. p. 10.

[14] Where a post-conviction petitioner brings a petition following a direct appeal or prior petition for post-conviction relief, allegations of error asserted therein may not be raised in the absence of a showing that the issue was unascertainable or unavailable at the time of trial, direct appeal or prior petition. *Clay v. State*, 533 N.E.2d 1270, 1273 (Ind. Ct. App. 1989), *trans. denied*. Bethel could have raised his claim of ineffective assistance of trial counsel during his first post-conviction proceeding in Case Number 71A03-1203-PC-139. We conclude the claim is waived.

[15] Waiver notwithstanding, with respect to claims of ineffective assistance of trial counsel, the Indiana Supreme Court has stated:

> To establish a post-conviction claim alleging violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). First, a defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed to the defendant by the Sixth Amendment. Second, a defendant must

show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, meaning a trial whose result is reliable. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is one that is sufficient to undermine confidence in the outcome.

*Passwater v. State*, 989 N.E.2d 766, 770 (Ind. 2013) (citations and quotations omitted).

[16]     The Indiana Supreme Court has further stated:

Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. We recognize that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

*Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002) (citations omitted). Further, a poor strategic choice does not necessarily establish ineffective assistance of counsel "even though such choices may be subject to criticism or . . . ultimately prove detrimental to the defendant." *Garrett v. State*, 602 N.E.2d 139, 142 (Ind. 1992). For these reasons, we will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given

deference in choosing a trial strategy which, at the time and under the circumstances, seems best. *White v. State*, 25 N.E.3d 107, 134 (Ind. Ct. App. 2014), *trans. denied*.

[17] At the time Bethel committed his offenses, a defendant could potentially avoid criminal liability by proving he or she "was compelled" to engage in the prohibited conduct "by threat of imminent serious bodily injury to himself or another person." Ind. Code § 35-41-3-8 (1977). A successful defense of duress establishes a "lack of criminal culpability" for "otherwise criminal acts." *Sanders v. State*, 466 N.E.2d 424, 428 (Ind. 1984) (discussing statutory defenses including duress). Among other limitations, the defense "does not apply to a person who . . . committed an offense against the person as defined in IC 35-42." *Id.* There is no dispute that Bethel's offenses of robbery, attempted robbery, and attempted murder are crimes against the person.

[18] To determine the reasonableness of Bethel's trial counsel's strategic choices, it is necessary to understand the case against Bethel as presented at his original trial in 1991. In relevant part, the State alleged that Bethel attempted to rob, or assisted Crenshaw in attempting to rob, Don Wrobel and Patrizia Robaska at the J&S Dairy Mart, and then attempted to rob, or assisted Crenshaw in attempting to rob, Robert Lucas and others at the Burger Dairy store. The State further alleged that Bethel attempted to kill, or assisted Crenshaw in attempting to kill, Officer Gary Jerzak and Corporal Richard Powers. For each charge, the State claimed that Bethel either committed the offenses as the principal actor or

was criminally liable because he aided Crenshaw in committing the offenses. Tr. Ex. Vol. 3, p. 43.

[19] In determining whether a person aided another in the commission of a crime, we consider the following factors: (1) presence at the scene of the crime; (2) companionship with another engaged in criminal activity; (3) failure to oppose the crime; and (4) a defendant's conduct before, during, and after the occurrence of the crime. *Woods v. State*, 963 N.E.2d 632, 634 (Ind. Ct. App. 2012). An accused's mere presence at the scene of a crime, or mere acquiescence in the commission of a crime, is insufficient to convict the accused as an accomplice. *Peterson v. State*, 699 N.E.2d 701, 706 (Ind. Ct. App. 1998).

[20] Based on our review of the trial transcript, Bethel's counsel did not raise a statutory defense of duress to excuse otherwise criminal acts because counsel did not concede that Bethel had committed any criminal acts in the first place. Instead, counsel claimed: (1) Bethel was not guilty of any charges as a principal actor because Crenshaw committed all offenses; and (2) Bethel was not guilty as an accomplice because Crenshaw coerced him under threat of death into accompanying Crenshaw on the crime spree. Counsel claimed Bethel was merely present for Crenshaw's crimes, and mere presence is insufficient to establish accessory liability. Bethel's counsel explained his theory of defense to the jury during closing argument:

> Now, you have two counts of Robbery. You've heard Stephen
> say that he was there because he was afraid, because he had been
> coerced or under duress. It is not a defense to commit the crime

of Robbery or Attempted Murder under duress, but it can explain how somebody can be at a place where a robbery is being conducted without taking part in that robbery, where you accompany the person who is doing the robbery, that you don't do it yourself, you do nothing to aid and abet him.

Tr. Ex. Vol. 4 p. 94. Rather than displaying ignorance of the law, Bethel's counsel clarified that his strategy was to challenge the evidence supporting the State's case. He did not concede, implicitly or explicitly, that the State proved the offenses but that Bethel was not guilty due to duress.

[21] Counsel's defense strategy was reasonable due to the extensive evidence that placed Bethel at the scenes of the crimes. At trial, Wrobel identified Bethel as one of the J&S Dairy Mart suspects. Robert Lucas and Charles Flora, who witnessed the Burger Dairy store incident, both told the jury that they had identified Bethel as one of the suspects after Bethel's arrest based on Bethel's clothing and body type. In addition, at trial Officer Jerzak identified Bethel as one of the suspects. Corporal Powers identified Bethel as one of the suspects who fled in a car. Powers further stated he got a good look at Bethel, the passenger, because Bethel looked back at him several times. In addition, Corporal Powers saw Bethel throw something out of the car. Finally, after the fleeing car wrecked, Corporal Powers saw Bethel get out of the car and captured him at gunpoint.

[22] After the arrest, an officer searched the wrecked car and found a jacket that contained a telephone bill for Steven Bethel. Another officer with a K-9 unit searched areas near the Burger Dairy store and along the route of the car chase.

The officer found a revolver near the location where Corporal Powers saw Bethel throw something out of the car. The officer further found another revolver near the Burger Dairy store. Lucas identified those revolvers as the guns that were used in the Burger Dairy store attempted robbery. Under these circumstances, it was reasonable for counsel to concede Bethel was present at the scene and develop a strategy of defense that accounted for Bethel's presence yet maintained his innocence.

[23] Bethel's counsel supported his theory of defense by stating during opening statements that "Stephen Bethel was as much a victim as the other person" and "[h]e was only acting out of fear for his own life." Tr. Ex. Vol. 3, p. 44. Further, counsel cross-examined Wrobel and Lucas, who admitted that Bethel never threatened them. In addition, on cross-examination Flora testified that he had initially told the police that Crenshaw, not Bethel, shot at him in the store's parking lot. Finally, during Bethel's case-in-chief, he testified that Crenshaw was angry at him due to an unpaid debt and had intimidated him into going along by firing a handgun in Bethel's vicinity.

[24] To be sure, counsel's defense strategy was not without challenges. Officer Jerzak and Corporal Powers both testified that Bethel, not Crenshaw, was the suspect who shot at them. Bethel's counsel addressed this issue by arguing to the jury that the officers were confused as to the identity of the shooter "in the heat of battle." Tr. Ex. Vol. 4, p. 99. Further, counsel's strategy was ultimately unsuccessful, because the jury found Bethel guilty as charged. Nevertheless, an unsuccessful defense strategy does not establish that counsel was

"constitutionally ineffective." *Hinesley v. State*, 999 N.E.2d 975, 983 (Ind. Ct. App. 2013), *trans. denied*. We cannot conclude Bethel's trial counsel performed deficiently in selecting and pursuing his strategy.

Bethel argues his counsel should have pursued a different, allegedly stronger strategy: challenging the on-site identifications of Bethel by witnesses Wrobel, Lucas, and Flora. After the officers arrested Bethel, they took him to the J&S Dairy Mart and the Burger Dairy store, where the three men separately identified Bethel as one of the suspects.

We first reiterate that we do not "lightly speculate as to what may or may not have been an advantageous trial strategy." *White*, 25 N.E.3d at 134. Bethel's counsel chose to concede that Bethel was present for the offenses while arguing that Bethel was not criminally liable as either a principal or an accomplice. The attorney supported the theory at trial by providing evidence and argument, and by challenging the State's evidence.

In any event, the Fourteenth Amendment's guarantee of due process of law requires the suppression of evidence when the procedure used during a pretrial identification is impermissibly suggestive. *Rasnick v. State*, 2 N.E.3d 17, 23 (Ind. Ct. App. 2013), *trans. denied*. In some circumstances, a show-up identification may be so unnecessarily suggestive and so conducive to irreparable mistake as to constitute a violation of due process. *Id.* (quotation omitted). The admissibility of a show-up identification turns on an evaluation of the totality of the circumstances and whether they lead to the conclusion that the

confrontation was conducted in a manner that could guide a witness into making a mistaken identification. *Gordon v. State*, 981 N.E.2d 1215, 1218 (Ind. Ct. App. 2013). Our courts consider the following factors in evaluating the admissibility of a show-up identification:

> (1) the opportunity of the witness to view the criminal at the time of the crime,
>
> (2) the length of initial observation of the criminal,
>
> (3) lighting conditions,
>
> (4) distance between the witness and the criminal,
>
> (5) the witness's degree of attention,
>
> (6) the accuracy of the witness's prior description of the criminal,
>
> (7) the level of certainty demonstrated by the witness, and
>
> (8) any identifications of another person.

*Id.*

[28] Wrobel testified that he remembered Bethel as one of the suspects due to his unusual hairstyle. Wrobel had interacted with Bethel and Crenshaw for several minutes during the attempted robbery, at close range. Further, he unequivocally identified Bethel at trial.

[29] As for Lucas, he interacted with Bethel and Crenshaw for about ten minutes, at close range, inside the Burger Dairy store. Lucas had every incentive to pay attention to the men because they were armed. After Bethel and Crenshaw left, Lucas called the police and provided a description of the men. The description is not in the record, but twenty to thirty minutes later, officers brought Bethel and Crenshaw back to the Burger Dairy store. Lucas identified them based on their body types and Crenshaw's clothing, and he was certain in his identification. Finally, Flora saw Bethel and Crenshaw inside the Burger Dairy store as he approached it. He returned to his vehicle and saw them leave the store, both holding guns. After the police brought Bethel and Crenshaw back to the store twenty to thirty minutes later, Flora recognized Bethel by the clothes he wore and by a white streak in his hair.

[30] Considering the factors set forth above, especially the length of duration of the initial observations of Bethel and Crenshaw by the witnesses at close distance, we cannot conclude that the post-arrest show-up identification process was unduly suggestive. *See Lyles v. State*, 834 N.E.2d 1035, 1045 (Ind. Ct. App. 2005) (show-up identification process was not unduly suggestive; victim of robbery had encountered defendant close up for several minutes and provided an accurate description; victim later identified defendant as the robber), *trans. denied*. Challenging the show-up identifications would not have been a stronger or more effective strategy than the one counsel chose: attempting to show that Bethel was not guilty of the offenses because he was not the principal actor and was merely present for Crenshaw's crimes. Bethel has failed to demonstrate the

post-conviction court erred in denying his successive petition for post-conviction relief.

## Conclusion

[31] For the reasons stated above, we affirm the judgment of the post-conviction court.

[32] Affirmed.

[33] Mathias, J., and Altice, J., concur.